**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JODY M. OSTER,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:15-cv-2746** |
| | : | |
| **v.** | : | **JUDGE ALGENON L. MABRLEY** |
| | : | |
| **HUNTINGTON BANCSHARES INC.,** *et al.***,** | : | **Magistrate Judge Kemp** |
| | : | |
| **Defendants.** | : | |

## OPINION & ORDER

In this employment-discrimination case, Jody Oster, a long-standing in-house attorney with Huntington Bancshares Inc. ("Huntington" or "the Bank"), alleges that she was terminated due to gender discrimination and retaliation for complaining about her then-supervisor, Thomas Eck. Oster filed suit in August, 2015, alleging the following causes of action:

(1) Gender discrimination, in violation of Title VII and Ohio law (Counts I and II);

(2) Retaliation, in violation of Title VII and Ohio law (Counts III and IV); and

(3) Aiding and abetting a discriminatory act, in violation of Ohio law (Count V).[1]

The Bank has moved for summary judgment on all of Oster's claims. (Doc. 50). The Bank also raised an after-acquired evidence defense which, if proven, would limit its damages (if any) on Oster's underlying claims. (Doc. 30).

Oster filed a motion to strike several affidavits and other evidence that Huntington filed in connection with its motion for summary judgment (Doc. 81), and also moved for summary judgment on the Bank's after-acquired evidence defense. (Doc. 58).

---

[1] Oster named four defendants: Huntington Bancshares Inc., The Huntington National Bank, and individual defendants Thomas Eck and Richard Cheap. Counts I-IV apply to all four named defendants. (Doc. 1). Count V applies only to individual defendants Eck and Cheap. (*Id.*).

As explained below, Oster has shown that at least some of Huntington's proffered evidence is inadmissible and, therefore, should be disregarded in ruling on the Bank's motion for summary judgment. Likewise, Oster has presented sufficient evidence to withstand summary judgment on all of her claims. The Bank, moreover, has presented sufficient evidence to withstand summary judgment on its after-acquired evidence defense, at least insofar as Oster's *pre*-termination misconduct is concerned. For these reasons, the Court: (1) **GRANTS in part** and **DENIES in part** Oster's motion to strike; (2) **GRANTS in part** and **DENIES in part** the Bank's motion for summary judgment; and (3) **GRANTS in part** and **DENIES in part** Oster's motion for summary judgment on the Bank's after-acquired evidence defense.

## I. BACKGROUND

### A. Factual Background

Jody Oster served as in-house counsel for Huntington for over twenty-one years. She eventually led the Special Assets Division ("SAD"), a department responsible for commercial loan workouts and litigation relating to defaulted or troubled commercial loans. In that capacity, she represented the Bank and its affiliates in hundreds of actions in state and federal court. For most of her tenure (November 1993 through January 2013), Oster reported to the same individual—John Liebersbach. During that stretch, Oster enjoyed *mostly* positive relationships with her supervisors and co-workers, including Huntington's General Counsel, Richard Cheap. That said, the Bank contends that she began exhibiting strained interpersonal relationships with several colleagues as early as 2012. When Liebersbach retired in 2013, Oster assumed most of his duties, including management and reporting of all significant and complex litigation, management of the audit letter process, and the selection, engagement, and management of outside counsel on a bank-wide basis.

## 1. Deteriorating Personal Relationships

If the Bank's version of events is believed, then Oster began exhibiting troubling signs in 2012. The Bank contends that she did not get along with SAD's leader, Fred Manning; that another attorney, Rachel Mulchaey, left the Bank in March 2012 due, in part, to interpersonal issues with Oster; that Cheap and Associate General Counsel Larry Case noticed strained relationships between Oster and other attorneys, including Larissa Osborn, Becky Spainhoward, and Annette Houck, which ultimately resulted in Spainhoward resigning, partly due to Oster's "toxic" nature; and that Cheap and Case noticed other strained working relationships with colleagues and clients. The Bank also contends that Cheap requested the Human Resources Department to conduct "stay interviews" of Legal Department employees to better understand team dynamics and other concerns. During those interviews, several co-workers volunteered various issues with Oster's behavior, including the fact that she picked on a paralegal, was not a team player, seemed retaliatory, and was dishonest at times to cover for herself.

As both parties agree, Oster received generally favorable evaluations of her legal work and performance until mid-2014. That's when matters took a turn for the worst, no matter whose version of events is believed.

The Bank alleges that, in August 2014, Oster improperly bullied paralegal Susan Wangler in front of their colleagues for receiving permission to attend a Pelatonia event on a day in which Oster needed assistance. This incident ended in a written warning to Oster for not confronting Wangler or her supervisor, Annette Houck (who had approved the time off), in private; Oster levying a cross-allegation of bullying *from* the paralegal; and the paralegal soon transferring out of the Legal Department due to Oster's alleged mistreatment.

The Bank also alleges that, in 2014, Cheap considered terminating Oster as part of a Reduction-in-Force ("RIF").  But Cheap backed off from the idea because the Bank could not replace Oster if her job were eliminated as part of the RIF.  Nevertheless, by late 2014, Cheap continued to hold "serious concerns" about Oster's employment moving forward.

## 2.  Huntington Hires a New Supervisor for Oster

Matters continued to deteriorate in late 2014, when Huntington hired Thomas Eck as Associate General Counsel.  Due to Eck's experience with litigation, Cheap decided that, in addition to taking over the duties for the attorney he was replacing, Eck would also manage Oster and oversee her work as the Bank's primary litigator.  Cheap felt Eck could provide a "fresh set of eyes" to manage Oster and to assess litigation management more generally.

Eck and Oster began sparring immediately.  Oster alleges Eck began targeting her because of her gender from his first days at the Bank.  During one early interaction, Eck allegedly told Oster that a picture of her on Huntington's intranet directory was "wow" and "beautiful," and he purportedly continued on and on about it while making Oster uncomfortable. She contends that Cheap assisted Eck in his discrimination by telling him that he was Oster's "last chance," and that if Eck's "management of her did not result in improved interpersonal relationships with her co-workers, Oster's employment would be terminated."

The Bank alleges that Eck simply was doing his job—gathering information on how the Legal Department functioned, meeting with other attorneys and personnel, and shifting work assignments accordingly.  One of those shifts occurred in early 2015, when Eck transferred some SAD matters from Oster to another attorney, Larissa Osborn, both due to logistical concerns and to free-up Oster to become more involved in consumer collections.

### 3.  Oster Alleges that Eck's Discrimination Continued in Early 2015

Oster alleges that her relationship with Eck continued to deteriorate throughout January and February 2015, as he increasingly micromanaged her work and chastised her for apparent deficiencies.  Of note, nearly all of these allegations come from an affidavit that Oster submitted with her response in opposition to the Bank's motion for summary judgment (*see* Doc. 84-5); they do not stem from her deposition testimony or other evidence previously adduced.   The first flare-up occurred on January 14, 2015, when Eck allegedly scolded Oster for failing timely to respond to a request to use outside counsel.  Those requests fell in Oster's lane but, when she tried to explain, Eck allegedly interrupted and said, "I don't care what happened, don't let it happen again."  After further attempts to explain what had occurred, Eck again purportedly scolded Oster and told her, "You will do as you are told!"

Another incident allegedly occurred on January 20, 2015, when Eck told Oster to include him in decision-making regarding the use of outside counsel.  Oster apparently made those decisions on her own prior to Eck's arrival, and when she protested about the delay in running such routine choices by her new supervisor, he allegedly responded, "I don't care, you will do as you are told!"

On January 28, 2015, Eck allegedly told Oster she could no longer communicate with outside counsel, witnesses, or other colleagues—including the Bank's General Counsel, Larry Cheap—without first obtaining Eck's permission.  Oster claims she felt humiliated considering her prior experience and autonomy within the Legal Department, but she maintains that she "attempted to comply with Defendant Eck's demands."

Then, on January 30, 2015, Oster, her previous manager, Larry Case, and Eck met for her 2014 Performance Review. Oster received an overall score of "3" out of "5," or "fully meets" expectations, for 2014.[2] Nevertheless, her performance review also stated that her "relationships with a few in the department are still strained and in need of further work (by both sides)."

On February 10, 2015, several Legal Department staff members, including Oster and Eck, attended a staff meeting. At the end of the meeting, another attorney asked Oster whether she had an update on the "Datacert Project," which was not on the agenda. Oster maintains that, because of Eck's earlier instructions not to communicate with others without his prior approval, she simply responded that she did not have an update to provide at that time. Oster contends that Cheap and Eck were scheduled to meet later in the month to discuss the status of the project and whether to abandon it or stay with it.

The next day, Oster and Eck learned that outside counsel they had previously selected for a FINRA matter were unavailable due to a previously undisclosed conflict. Oster and Eck scrambled to find replacement counsel. Although Cheap was involved in the discussion, Oster alleges he deferred to her regarding her choice to use local counsel rather than counsel from Washington, D.C., or New York City, as Eck had recommended. According to Oster, Eck then came into her office, shut the door, and began yelling at her for not speaking with him before talking to Cheap. Oster alleges that Cheap had contacted her directly, so she had no choice but to respond. But Eck purportedly continued to yell at her for her apparent insubordination.

---

[2] Huntington's performance reviews operate on a 1-5 scale, with a score of "1" indicating "does not meet" expectations; a score of "2" indicating "does not fully meet" expectations; a score of "3" indicating "fully meets" expectations; a score of "4" indicating "exceeds" expectations; and a score of "5" indicating the employee "far exceeds" expectations. (Doc. 85-5, PageID 2391).

Oster alleges that, because Eck's behavior on February 11 had occurred repeatedly, with no end in sight, "she contacted Human Resources [Representative] Stephanie Wilder, who was assigned to the Legal Department." Oster learned from Wilder's manager, Amy Heaton, that Wilder was out of the office until the following week. Heaton suggested that another HR representative, Emily Dahs, was available if Oster needed to speak to someone right away. Oster replied that it was "not urgent," and that she could wait until Wilder returned the following week. As both parties agree, however, things began to unravel the following day.

### 4. Matters Come to a Head on February 12, 2015

On February 12, 2015, Eck met with Oster to express concerns that she had lied during the staff meeting when she told a colleague there was no update on the Datacert Project. Eck believed there was a significant update—namely, that Huntington was considering abandoning the project. As such, Eck told Oster that her response was not truthful, and he instructed her to correct it publicly. Oster alleges that Eck was hostile and forceful throughout the meeting; that his tone was intimidating; that he was seething and on the verge of yelling at her; and that, at one point, he rose from his chair, gritted his teeth, and slammed his fist on the desk while berating her for allegedly lying to her colleague. Oster alleges that she was shocked and considered Eck's behavior physically threatening and intimidating.

At the same meeting, Eck instructed Oster to include him on a call with Department of Justice attorneys regarding a subpoena issued to Huntington. Oster alleges that she previously expressed concern to Eck regarding the participation of another, new attorney on the call; she apparently told him that his presence might signal to the DOJ that Huntington's concerns regarding the investigation were heightened at a time when it appeared the matter might be coming to an end. But Eck insisted on being on the call or, at the very least, sitting in from his

own office while on mute. Oster alleges that she told Eck the latter approach would be unethical. But, according to Oster, Eck would not take "no" for an answer. Instead, he instructed her to follow directions, and he only backed down after a male attorney similarly recommended that Eck not be on the call. Oster alleges that, by now, she had grown uncomfortable and warned Eck as follows: "I'm uncomfortable. You have been harassing me and attempting to intimidate me from the start. If I was a man, you would not be treating me this way."

### 5. Oster Complains to Human Resources

Following their "explosive" meeting from February 12, 2015, Oster and Eck went their separate ways. Oster tried to call the Bank's General Counsel, but she could not reach him. Instead, she began to write down a series of detailed notes regarding what had transpired. Similarly, Eck emailed Oster to reiterate his instructions about the DOJ call and to be included in witness interviews for a different matter. Later that day, Oster contacted Emily Dahs from Human Resources, who was filling in for Stephanie Wilder for the week. The two women met that afternoon to discuss Oster's concerns.

Oster did not provide Dahs with a copy of her notes; instead, she complained that Eck was "micromanaging" her and wanted to be included in phone calls and meetings for her litigated matters, including the DOJ subpoena. She also told Dahs that Eck's voice was raised, that he told her to "do as you are told," and that he was aggressive. Oster testified that she told Dahs that if she were a man, Eck would not be doing this to her. Dahs, who felt Oster was upset and distressed, said she would tell Heaton and Wilder (the other HR representatives) what had transpired and that one of them would follow up with her. Oster expressed concern over meeting one-on-one with Eck in the future, so she requested that someone from HR attend any such meetings moving forward.

Dahs then informed her manager, Amy Heaton, of Oster's account of the meeting with Eck. Heaton called Eck to learn his side of the story. Eck denied that he raised his voice but admitted that his tone expressed his frustration at what he believed to be Oster's insubordination. Heaton concluded that the relationship between Eck and Oster needed repair, so she instructed Wilder to attend and facilitate their one-on-one meetings, as Oster had requested. Wilder then met with Dahs to review the information Oster had initially shared. A week later, Wilder met with Oster to discuss her initial conversation with Dahs. Wilder told Oster that she would attend future meetings with Eck. Oster testified that she told Wilder she would not be treated this way if she was a man. The two apparently discussed next steps for both Oster and Eck.

On February 18, 2015, Oster, Eck, and Wilder met. By then, Wilder understood Oster's concerns to be Eck's management style and his expectations regarding his involvement in her matters. Wilder decided to use the meeting to facilitate the relationship and to clarify Eck's expectations. Unfortunately, the meeting was unproductive due to a time-sensitive legal issue. Nevertheless, at the end of the meeting, Wilder made Eck aware that Oster sought clarification of his expectations regarding her work. Oster alleges that Eck denied instructing her to include him in every call and meeting, telling her she needed his permission before going forward without him, or instructing her that she could only speak to Cheap with Eck's prior approval.

### 6. Continued Fallout from the February 12, 2015 Meeting

Because the first meeting between Eck, Oster, and Wilder was cut short, Eck sent an email to Oster detailing his expectations, including litigation management changes he planned to make. He expressed concern as to how Oster might perceive these changes given their recent issues. Oster believes that Eck was concerned she might view his actions as retaliatory given her reporting of his conduct to Human Resources.

On February 21, 2015, Oster felt slighted when she received a call from outside counsel in the FINRA matter to discuss hourly rates. Ordinarily, she would have discussed the rates with the attorney, but under Eck's new policies, she could not. Oster reports feeling "humiliated" at the end of the call. Oster told Eck about the call, but she alleges that he became upset with her for talking with outside counsel without including him. Oster further alleges that Eck would not accept her explanations for speaking with outside counsel and did not care that Oster had a longstanding working relationship with the attorney. According to Oster's affidavit, Eck then yelled: "I'M NOT FUCKING LARRY CASE!" Following this discussion, Oster alleges that her concerns about Eck increased; she was concerned that she would not be able to satisfy his demands and get her work done, she felt that if she were a man, he would not be treating her this way, and she believed that Eck treated her as if she were subservient to him.

As a result, Oster emailed Wilder to complain about Eck's involvement in her work and his proposed litigation management changes. In planning for their next one-on-one meeting, Wilder asked Oster to share the "most critical" item to begin the meeting with Eck. Oster responded as follows: "Right now, I'm most concerned about how what Tom [Eck] is doing and how he is going about doing them. It seems he is changing things to change them and the changes will make more work for me or make it difficult for me to do my job."

Oster also responded to Eck's email, in which he outlined his expectations and upcoming departmental changes. Oster not only expressed disagreement with many of Eck's expectations, but she also took the opportunity to advise Eck of *her* expectations for him—at times instructing Eck to respond to certain emails and demanding that he include her in various meetings. Oster also mocked Eck's suggestion that he valued her input, complaining that his actions were "undermining and disrespectful" and that he was "working behind the scenes against [her]."

Around the same time, Oster began forwarding confidential and privileged emails to her personal email account on a self-help basis so that she "had a record" against Eck. Huntington maintains that her actions violated Bank policies and that she has thwarted discovery in this lawsuit by refusing to provide access to her computer for forensic analysis.

### 7. The February 25, 2015 Meeting

On February 25, Oster and Eck met again, with Wilder sitting in for HR. Their discussion centered on Eck's instructions to, and expectations of, Oster. Oster again complained that Eck was micromanaging her and changing her job duties and descriptions. Wilder, however, explained that, as Oster's manager, Eck had authority to change how litigation was managed, to be involved in her litigated matters, and to shift Oster's workload for the good of the department. In Wilder's estimate, Oster refused to accept this explanation. Wilder also felt that Oster would not accept Eck as her manager or the changes he was trying to make within the department. The meeting ended with Eck, Oster, and Wilder agreeing that they needed to escalate matters to the General Counsel. Oster alleges that Eck claimed the General Counsel already approved of everything he was doing, "as if to intimidate [her]." Oster also alleges that, at the end of the meeting, Wilder assured her that her job was not in jeopardy and that no one wanted her to leave.

### 8. Huntington Decides to Terminate Oster's Employment

Later that day, Cheap, Eck, and Wilder met to discuss Oster's continued employment. Wilder told Cheap that Oster would not accept Eck's management and was resisting his efforts to implement litigation-management changes. As a result, Wilder recommended that Oster be terminated. The Bank contends that Cheap decided to terminate Oster's employment due to her history of interpersonal issues with co-workers, culminating in her current refusal to accept Eck's management.

On March 4, Cheap and Wilder met with Oster to inform her of the decision. Cheap told Oster that she was being terminated because the Legal Department was going in a "different direction." Unbeknownst to Cheap or Wilder, Oster had surreptitiously recorded the meeting. Oster alleges in her affidavit that Cheap made other representations at her termination meeting that were not true, including the fact that "nobody else in the Legal Department obviously knows about this," when, in fact, Eck participated in an earlier meeting regarding her termination.

### 9. Huntington Replaces Oster with a Female Attorney

On August 17, 2015, another female attorney, Jennifer Mountcastle, replaced Oster as Senior Counsel, reporting to Eck. Mountcastle performs Oster's previous duties related to commercial litigation, including management of outside counsel representing Huntington as well as direct representation of the Bank in court. Mountcastle also handles all internal reporting of litigated matters, audit response letters, and other litigation-related duties performed by Oster prior to her termination.

## B. Procedural Background

On August 21, 2015, Oster filed this lawsuit against the Bank, Eck, and Cheap, alleging gender discrimination and retaliation in violation of Title VII and Ohio Revised Code § 4112.02. (Doc. 1). Oster also alleges that Eck and Cheap "aided and abetted" discriminatory acts in violation of Revised Code § 4112.02(J). (*Id.*). The Bank has moved for summary judgment on all claims (Doc. 50), and also has raised an after-acquired evidence defense in support of Oster's termination. (Doc. 30). Oster has filed a motion to strike several affidavits and other evidence that Huntington filed in connection with its motion for summary judgment. (Doc. 81). She also has moved for summary judgment on the Bank's after-acquired evidence defense. (Doc. 58). All matters have been fully briefed and argued and now are ripe for review.

## II.  STANDARDS OF REVIEW

### A.  Motion to Strike

A 2010 Amendment to Federal Rule of Civil Procedure 56 changed the mechanism for objecting to supporting materials filed in connection with motions for summary judgment. *Foreword Magazine, Inc. v. OverDrive, Inc.*, No. 1:10-cv-1144, 2011 WL 5169384, at *2 (W.D. Mich. Oct. 31, 2011).  Now, "motions to strike are no longer appropriate."  *Id.* at *2 n.1. Instead, the Court will treat Oster's motion as an objection under Rule 56(c)(2), which provides: "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  The Court will disregard only the inadmissible portions of Huntington's supporting materials.  *See Roshen v. IBM*, No. 2:14-cv-260, 2016 WL 950363, at *8 (S.D. Ohio Mar. 14, 2016).

### B.  Motions for Summary Judgment

Both parties moved for summary judgment on various claims and defenses under Civil Rule 56.  Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). The movant bears the burden of proof on both points.  *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 710 (6th Cir. 2001).  In determining whether this standard is met, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Crouch v. Honeywell Int'l, Inc.*, 720 F.3d 333, 338 (6th Cir. 2013). As always, this inquiry turns on "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251-52 (1986)).

# III. ANALYSIS

This Opinion and Order will address matters in the following sequence: (1) Oster's motion to strike the Bank's supporting affidavits and deposition testimony; (2) the Bank's motion for summary judgment; and (3) Oster's motion for summary judgment on the Bank's after-acquired evidence defense.

## A. Oster's Motion to Strike

### 1. Alleged Inadmissible Hearsay Concerning Oster's Interpersonal Conflicts

Oster first moves to strike a series of statements from Stephanie Wilder, Emily Dahs, and Annette Houck regarding Oster's interpersonal conflicts while at Huntington on the ground that they constitute impermissible hearsay. (Doc. 81, PageID 2174 (seeking to exclude Wilder Aff., Doc. 50-6, ¶¶ 4, 7, and 8); *id.* at PageID 2178-79 (seeking to exclude Wilder Dep., Doc. 57, pp. 59-63, 67, 69-72, 98-99, and 110); *id.* at PageID 2181-82 (seeking to exclude Dahs Aff., Doc. 50-3, ¶ 4); *id.* (seeking to exclude Houck Aff., Doc. 50-5, ¶ 7)).

Oster argues that these portions of the record constitute impermissible hearsay about her relationships at the Bank because they merely repeat what other employees told the affiant or deponent; she contends the statements are not based on personal knowledge. The Bank counters that the statements are not hearsay, because they are not being used to prove the truth of the matter asserted. Rather, the Bank is relying on the statements to show only that the defendants had a non-discriminatory motive for terminating Oster's employment. *See Blair v. Henry Filters*, 505 F.3d 517, 524 (6th Cir. 2007) ("By definition, only out-of-court statements offered to prove the truth of the matter asserted are hearsay.").

The Sixth Circuit has addressed this very issue and largely rejected Oster's position. *See Bush v. Dictaphone Corp.*, 161 F.3d 363, 366-67 (6th Cir. 1998). In *Bush*, the plaintiff moved to strike significant portions of an employer's declarations supporting its summary judgment motion because the declarations included statements made to the employer from the plaintiff's former colleagues that the plaintiff was "abusive and unstable," and, in the words of one secretary, had "gone off the deep end." *Id.* There, as here, the declarations failed to identify at least some of the plaintiff's former colleagues who made the complaints. *Id.* at 366. Nevertheless, the Sixth Circuit affirmed admission of these statements for the purpose of considering "the non-discriminatory grounds upon which the declarants based their decisions with regard to the [plaintiff's] employment status." *Id.* at 367. In short, in "an employment discrimination case, an employer can support its case on the basis of statements made to it, even though those statements are later determined to have been untrue." *Bickley v. FMC Techs., Inc.*, No. 3:02CV7212, 2003 WL 21303409, at *4 (N.D. Ohio June 5, 2003) (rejecting plaintiff's hearsay argument), *vacated on other grounds*, 282 F. Supp. 2d 631 (N.D. Ohio 2003); *see also Jones v. Kilbourne Med. Labs.*, 162 F. Supp. 2d 813, 817 n.6 (S.D. Ohio 2000) (same).

At a high level of generality, *Bush* counsels in favor of considering the challenged materials. The statements made by Oster's former colleagues concerning her "toxic" nature, Wilder's testimony related to Oster's former colleagues voicing their concerns about her, and the statements made to Huntington personnel related to Oster's interpersonal conflicts all seem admissible to demonstrate the Bank's non-discriminatory motivation for terminating her employment. *See Bush*, 161 F.3d at 366-67. In this context, the challenged statements do not qualify as hearsay in the first place. *Id.*

Nevertheless, as Oster notes, *Bush*'s holding was limited to statements where the declarants were the decision-makers with regard to the plaintiff's employment. *Id.* at 366 ("Each declaration stated that the declarant, *a corporate decision-maker*, had been told by unidentified co-workers that Bush was abusive or unstable." (emphasis added)); *see Daniels v. Square D Co.*, No. 3:05-0736, 2006 WL 3761924, at *7 (M.D. Tenn. Dec. 21, 2006) ("[W]here a decision-maker learns about an employee's behavior from others, the decision-maker can testify as to those statements without running afoul of the hearsay rule . . . ."). Oster thus argues that, since Cheap was the primary decision-maker who terminated her employment, statements from *other* declarants (Wilder, Dahs, and Houck) do not fall under the exception from *Bush*.[3]

In other cases, however, the Sixth Circuit has recognized the relevance of statements made by declarants "who did not independently have the authority . . . to fire the plaintiff, *but who nevertheless played a meaningful role in the decision*." *See, e.g.*, *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354-55 (6th Cir. 1998) (emphasis added) (collecting cases). The Court, therefore, must determine whether "a reasonable jury could conclude that [the relevant declarants were] in a position to influence [Cheap's] decision" to terminate Oster's employment. *Id.* at 355.

Here, the challenged statements pass muster, at least with respect to Wilder and Dahs. Wilder played a meaningful role in the decision to terminate Oster's employment. She sat in on all one-on-one meetings between Oster and Eck in the waning days of Oster's employment; she met with Cheap and Eck to discuss their options; she recommended that Oster be terminated; and she attended the meeting when Cheap informed Oster that she was being terminated. Accordingly, the Court will consider the Wilder materials.

---

[3] As explained in Section III.B.2.b.ii., *infra*, Oster's position in her motion to strike runs counter to her position in opposition to summary judgment as to who decided to terminate her. Regardless, the Court will apply the law as it stands to both motions.

Dahs presents a closer call, but she too played a meaningful role in the decision to terminate Oster's employment. After all, Dahs was the first HR representative to meet with Oster regarding her complaints about Eck; Dahs relayed those concerns directly to Wilder; and Wilder and Dahs met personally to review the information that Oster initially had shared. It stands to reason that, in discussing a contentious employment situation involving two high-ranking in-house attorneys, Dahs imparted her knowledge regarding Oster's interpersonal conflicts to Wilder (whether that knowledge was true or not). Accordingly, the Court will consider the challenged paragraph from the Dahs affidavit regarding attorney Rachel Mulchaey's statement that she resigned, in part, due to personal issues with Oster.

The challenged paragraph from Houck's affidavit, however—involving paralegal Susan Wangler's statement that she transferred due to Oster's mistreatment—does not pass muster, even under the relaxed standard from *Ercegovich*. There simply is no reason (at this stage) to believe that Houck played a meaningful role in the decision to terminate Oster's employment. Accordingly, the Court will not consider paragraph seven from Houck's affidavit in evaluating the Bank's motion for summary judgment.

## 2. Ms. Wilder's Notes During Exit and Stay Interviews

Oster next moves to strike two sets of notes that Wilder prepared and appended to her affidavit on the ground that the notes constitute double hearsay—Wilder's notes (level one), based on out-of-court statements from other individuals (level two). (Doc. 81, PageID 2175-78 (seeking to exclude "The Wilder Notes," Doc. 50-6, PageID 518-22)). Wilder prepared the first set of notes during her exit interview with attorney Becky Spainhoward. Wilder prepared the second set while conducting the "stay interviews" that Cheap asked Human Resources to complete in 2014.

Oster argues that Wilder's notes should be stricken because they contain two levels of hearsay regarding derogatory comments from other Huntington employees about their relationships with her. The Bank contends that both sets of notes qualify under the business records exception, *see* Fed. R. Evid. 803(6), and that their underlying contents do not qualify as hearsay because, again, the Bank is not using those statements for the truth of the matter asserted, *see Bush*, 161 F.3d at 366-67.

To qualify under the hearsay exception for business records, the document must satisfy four requirements: "(1) it must have been made in the course of a regularly conducted business activity; (2) it must have been kept in the regular course of that business; (3) the regular practice of that business must have been to have made the [record]; and (4) the [record] must have been made by a person with knowledge of the transaction or from information transmitted by a person with knowledge." *Redken Labs., Inc. v. Levin*, 843 F.2d 226, 229 (6th Cir. 1988).

Here, the Bank has come up short in demonstrating the first and third requirements for admissible business records under Rule 803(6). Nothing in Wilder's affidavit or deposition testimony suggests that she (or HR more generally) conducted exit interviews as part of Huntington's regularly conducted business activity, let alone that she prepared notes as part of that regularly conducted business activity. (*See* Wilder Aff., Doc. 50-6, PageID 515-17). Nor does anything in her affidavit or deposition testimony suggest that she or HR conducted "stay interviews" in the course of a regularly conducted business activity, or that she prepared notes of those interviews as a regular business practice. (*See id.*). Nor, for that matter, has the Bank shown that creation of these notes was required as part of company procedure or Wilder's ordinary job duties.

If anything, Wilder's deposition testimony suggests that the "stay interviews" were isolated events, not regularly conducted activities of the business.  (*See* Wilder Dep., Doc. 57-1, PageID 1231 (acknowledging that "stay interviews" were conducted on a one-time request from the legal management team; that not all members of the department were interviewed; and that Annette Houck specifically asked Wilder to see if anyone had concerns with Oster)).  *See also Hooks v. Regents of Univ. of Cal.*, 394 F. App'x 522, 530-31 (10th Cir. 2010) (finding interview notes from a whistleblower investigation were not admissible under business records exception because investigation did not occur in the course of a regularly conducted business activity); *Sullivan v. Temple Univ.*, No. 11-7305, 2014 WL 641341, at *3 (E.D. Pa. Feb. 19, 2014) (finding that notes from hiring committee members were not admissible under business records exception because "[t]here is no evidence that the formation of a hiring committee in this case is defendant's regular practice").

To be sure, notes or summaries prepared in connection with human-resource investigations can, and often do, fit within the hearsay exception for business records.  But first, the proponent of those notes or summaries must establish the criteria set forth above for Rule 803(6).  *See, e.g.*, *Coleman v. Jason Pharms.*, 540 F. App'x 302, 307 (5th Cir. 2013) (admitting HR manager's records where she signed an affidavit showing that the records were made and kept in the regular course of defendant's business, were made at or near the time of the investigation, and were made in the course of her duties as HR manager and with her personal knowledge); *Crimm v. Mo. Pac. R.R. Co.*, 750 F.2d 703, 709 (8th Cir. 1984) (similar—Railroad company had a written policy requiring that an investigation be completed and that conversations of those interviewed "should be documented through written memoranda"); *O'Brien v. IBM*, No. 06-4864, 2009 WL 806541, at *8 n.17 (D.N.J. Mar. 27, 2009) (same).

Here, the Bank has failed to make that showing, at least at this stage of the proceedings. Accordingly, the Court will not consider Wilder's interview notes in ruling on the Bank's motion for summary judgment, and the Court need not reach the second level of purported hearsay—i.e., the underlying out-of-court statements from the employees Wilder interviewed.

### 3. Personal Impressions Regarding Oster's Performance

Oster next moves to strike statements from Richard Cheap and Larry Case on the grounds that both gentlemen lacked personal knowledge to make their respective testimony and that their testimony contains conclusory assertions about Oster's strained interpersonal relationships at the Bank. (Doc. 81, PageID 2179-80 (seeking to exclude Cheap Aff., Doc. 50-2, ¶¶ 3 and 8); *id.* at PageID 2180 (seeking to exclude Cheap Dep., Doc. 62, pp. 36, 99-100, 123, 140-41); *id.* at PageID 2182 (seeking to exclude Case Aff., Doc. 50-1, ¶ 4)).

Oster argues that these portions of the Cheap and Case materials are inadmissible because neither man had personal knowledge to make statements regarding her interpersonal conflicts at Huntington and because whatever statements they did make were too conclusory in nature. The Bank counters that the statements remain admissible because, as long-standing supervisors to Oster, both Cheap and Case were in positions that provided them with ample first-hand knowledge of her interpersonal conflicts and from which they logically could summarize.

To disregard an affidavit or deposition testimony on the basis of lack of personal knowledge, a party must demonstrate that the affiant or deponent had *no* foundational basis for his or her testimony—i.e., that the affiant or deponent "did not present any foundation showing that she was in a position to know that to which she was testifying." *See White v. Honda of Am. Mfg., Inc.*, 191 F. Supp. 2d 933, 943-44 (S.D. Ohio 2002) (denying motion to strike where the affiant's position and context demonstrated *some* personal knowledge).

And, as this Court previously held, "[p]ersonal knowledge may be inferred from the content of the statements . . . . [and] may also flow logically from the context of the affidavit." *Reddy v. Good Samaritan Hosp. & Health Ctr.*, 137 F. Supp. 2d 948, 956 (S.D. Ohio 2000) (quotation omitted). The type of statements rendered inadmissible due to lack of personal knowledge are those provided solely "on information and belief." *Id.* (quotation omitted). Moreover, an affiant may summarize his or her impressions of a situation without rendering those statements inadmissible on the grounds that they are conclusory. *See Kehoe v. Anheuser-Bush, Inc.*, 995 F.2d 117 n.3 (8th Cir. 1993) ("If the affiants have 'personal knowledge,' there is no reason why they should not be permitted to summarize their impression.") (affirming admission of statements that supervisors "treated Plaintiff and Bob Brunette 'with disdain'"), *abrogated on other grounds*, 643 F.3d 1031 (8th Cir. 2011).

Here, Cheap served as Huntington's General Counsel and acted as Oster's second-line supervisor—a position that provided him with familiarity and awareness of her interpersonal relationships at the Bank. Case, in turn, worked as Oster's direct supervisor from 2012 until late 2014, when Huntington hired Thomas Eck as his replacement. Together, Cheap and Case both worked in positions from which the Court can infer their personal knowledge regarding Oster's interpersonal issues and her work behavior more generally. *See Kehoe*, 995 F.2d at 117 n.3 ("Here, the affiants do have personal knowledge; they observed all of the principal actors in the work place. If the view stated in the affidavits is vulnerable . . . because of their limited opportunity to observe Hudson's attitudes, cross-examination can easily reveal these defects and expose them to the judgment of the jury."). Moreover, the fact that Cheap and Case summarized their observations regarding their "serious concerns" over Oster's "interpersonal issues" or "interpersonal relationships" does not render their statements inadmissible. *Id.*

The statements that Oster challenges from the Cheap and Case materials were not based solely on "information and belief." Rather, the Court can infer personal knowledge from the contents of the statements and the context in which they arise. Accordingly, the Court will consider the Cheap and Case materials in ruling on the Bank's motion for summary judgment.

### 4. Ms. Wilder's Purported Legal Conclusions and Lack of Personal Knowledge

Finally, Oster moves to strike three additional paragraphs from Wilder's affidavit regarding Oster's initial complaint to HR on the grounds that Wilder was stating a legal conclusion and/or lacked personal knowledge. (Doc. 81, PageID 2183 (seeking to strike Wilder Aff., Doc. 50-6, ¶¶ 12, 15, and 17)).

Oster argues that Wilder provided bare legal conclusions when she testified that nothing in her notes from her meetings with Oster and Eck on February 18 and 25, 2015, or her emails from Oster around the same time, suggested that Oster's complaints had to do with discrimination because of gender. She also argues that Wilder lacked personal knowledge or experience to testify regarding Oster's mental impressions. The Bank counters that Wilder was not making any legal conclusions regarding whether Oster was complaining about "protected activity." Instead, Wilder merely was testifying about facts within her personal knowledge—i.e., what Oster said and did in those meetings and in her emails.

The Bank is correct on both points. Wilder did not offer legal conclusions regarding the elements of Oster's claims. She merely testified about her perceptions and impressions from a series of meetings and from Oster's emails. (*See* Wilder Dep., Doc. 57-1, PageID 1221 ("Q: And so you're relying upon your notes that you took and your memory as to what she told you the problem was? A: Correct."); Wilder Aff., Doc. 50-6, ¶¶ 12, 15, and 17 (similar)).

Wilder testified that Oster did not make gender-based complaints to her, which is not a legal conclusion. Rather, Wilder testified to those facts within her personal knowledge that support Huntington's position that Oster did not engage in protected activity. These statements are proper and admissible at summary judgment. *See White*, 191 F. Supp. 2d at 943 ("While the Court is not bound to accept such conclusions, it may consider [the affiant's] claim on behalf of [the defendant] together with all other relevant facts.").

And Wilder only offered her opinion of whether Oster indicated that Eck would be treating her differently if she were a man. (*See* Wilder Aff., Doc. 50-6, ¶¶ 12, 15, and 17). Lay witnesses may offer opinion testimony that rationally relates to their perception of the witness and helps facilitate a clear understanding of the witness's testimony. *See* Fed. R. Evid. 701. Wilder's affidavit was based on her perception of Oster's complaints in various interviews, Wilder's memory, and statements that Oster made over a lengthy period of time; her testimony, moreover, helps explain the defendants' understanding of Oster's complaints. *See Yates-Mattingly v. Lineback*, No. 1:11-cv-753, 2013 WL 3976313, at *11 (S.D. Ohio Aug. 1, 2013) (permitting lay opinion testimony on the issue of whether a former supervisor discriminated on the basis of race under Federal Rule of Evidence 701).

Oster also argues that "[o]nly Plaintiff has personal knowledge of what she believed." True enough. But Wilder did not testify about what Oster actually *believed*; instead, she testified about what Oster *stated* to her, what was in her notes from Oster's interviews, and her impressions regarding Oster's statements. Wilder did not testify as to the ultimate issues of whether Oster had been discriminated against or whether she actually engaged in protected activity. Accordingly, the Court will consider paragraphs twelve, fifteen, and seventeen from Wilder's affidavit in evaluating the Bank's motion for summary judgment.

For these reasons, the Court **GRANTS in part** and **DENIES in part** Oster's motion to strike. (Doc. 81). The Court will disregard only the following materials when ruling on the Bank's motion for summary judgment, while considering the rest: (1) the portion of Annette Houck's affidavit regarding Paralegal Wangler's statement that she left the Legal Department because of Oster's mistreatment, (Houck Aff., Doc. 50-5, ¶ 7); and (2) Stephanie Wilder's notes from Attorney Spainhoward's exit interview and the "stay interviews" she conducted, which detail various interpersonal issues that Huntington employees experienced with Oster. ("The Wilder Notes," Doc. 50-6, PageID 518-22).

### B. Huntington's Motion for Summary Judgment

The Bank moved for summary judgment on all of Oster's claims. A Title VII plaintiff alleging discrimination or retaliation based on indirect evidence first must establish a prima facie case. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also, e.g.*, *Hoskins v. Oakland Cnty. Sherriff's Dep't*, 227 F.3d 719, 731 (6th Cir. 2000) (Title VII gender discrimination claims); *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491-92 (6th Cir. 2010) (retaliation claims). If Oster establishes a prima facie case, "then an inference of discrimination arises." *Hoskins*, 227 F.3d at 731. At that point, the burden of production shifts to the Bank, which "must set forth a legitimate, nondiscriminatory reason for [Oster's] discharge." *Id.* Assuming the Bank can do so, Oster "then has the opportunity to demonstrate that the [Bank's] asserted reason for taking the adverse action was pretextual." *Id.* Oster may demonstrate that the Bank's asserted reasons were pretextual by proving that they: (1) had no basis in fact; (2) did not actually motivate her termination; or (3) were insufficient to explain her termination. *Id.*; *see also Spengler*, 615 F.3d at 493.

### 1.  Gender Discrimination Claims (Counts I and II)

#### *a.  The Prima Facie Case*

In Counts I and II, Oster alleges gender discrimination, in violation of Title VII and Ohio Revised Code § 4112.02.  To establish a prima facie case, Oster must prove that she: (1) was a member of a protected class; (2) suffered an adverse employment action; (3) was qualified for her position at Huntington; and (4) was replaced by a male *or* treated less favorably than similarly situated males.  *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004); *see also Mendlovic v. Life Line Screening of Am., Ltd.*, 877 N.E.2d 377, 383 (Ohio Ct. App. 2007).

#### *b.  Oster Has Shown a Prima Facie Case of Gender Discrimination*

As both parties agree, Oster has satisfied the first three elements of her prima facies case.  Oster is a member of a protected class; she suffered an adverse employment action; and she was qualified for her position at Huntington.  Moreover, both parties agree that because Oster was replaced by another female attorney (a member of the same protected class), her prima facie case hinges on whether she was treated less favorably than similarly situated male attorneys.

Oster alleges that Eck treated her less favorably than two male attorneys: John Coburn and Mark Bjertness.  Eck became their supervisor at the same time he became Oster's supervisor.  According to Oster, this disparate treatment included micromanaging her, harassing her, commenting on her photo, directing her not to communicate with upper-level management without his approval, scolding her, dismissing her suggestions, telling her to do what she was told, meeting with other employees regarding her assignments without her involvement, deferring to the opinions offered by male attorneys while ignoring Oster's suggestions, demanding his involvement in meetings with outside counsel, and physically intimidating her.  Deposition testimony from Coburn and Bjertness supports Oster's claims.

Coburn denied that Eck treated him comparably to Oster. (*See* Coburn Dep., Doc. 85-1, PageID 2296-97). Coburn testified that he did not feel Eck micromanaged his work; that Eck never demanded to be present on phone calls with state or federal regulators; that Eck did not insist on being involved in interactions with outside counsel; that Eck did not require permission before Coburn spoke to the General Counsel; that Eck never berated him or criticized him publicly; and that Eck did not swear at him or physically intimidate him. (*Id.*).

Bjertness felt similarly. (Bjertness Dep., Doc. 85-2, PageID 2302-06). He testified that Eck only stepped in when Bjertness needed help with something; that Eck was a "hands-off" manager; that Eck never insisted he be present when Bjertness met with clients; that Bjertness had the choice whether to involve Eck in meetings; that Eck never micromanaged him or told him to do "as you are told"; that Bjertness participated in meetings and calls with regulators without Eck's presence; that he could communicate with the General Counsel without Eck's prior approval; and that Eck never got angry with Bjertness or criticized him publicly. (*Id.*).

Oster argues that a jury reasonably could conclude that Eck targeted, harassed, and bullied her because of her gender. *See Stallworth v. Wal-Mart Stores E., LP*, No. C-150355, 2016-Ohio-2620, at ¶¶ 12, 28-31 (Ohio Ct. App. Apr. 22, 2016) (agreeing that plaintiff satisfied prima facie case of discrimination by pointing to "evidence that [he] had been treated differently and had been subjected to different conditions of employment than similarly-situated Caucasian [workers]" where supervisor "never seemed to have a nice word for him, was always on his case, and scrutinized [him] more than other workers"); *Camp v. Star Leasing Co.*, No. 11AP-977, 2012-Ohio-3650, at ¶¶ 27-28 (Ohio Ct. App. Aug. 14, 2012) (reversing summary judgment after finding plaintiff adduced sufficient evidence that her supervisor "did not treat male employees in the same humiliating and demeaning ways that he treated her").

The Bank counters that, even if Eck treated Coburn and Bjertness more favorably than Oster, her prima facie case still fails because the male employees were not similar to her in all respects. Citing *Ercegovich v. Goodyear Tire & Rubber Co.*, the Bank argues that "to be deemed 'similarly-situated' in the disciplinary context," the individuals with whom Oster seeks to compare her mistreatment "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." 154 F.3d at 352 (quotation omitted). The Bank argues that Oster's comparisons fall short, because the male attorneys she points to did not engage in exactly the same behavior.

The Court is not persuaded by the Bank's argument. In *Ercegovich*, the Sixth Circuit *reversed* the grant of summary judgment to the employer because the district court "appl[ied] an exceedingly narrow reading of the *Mitchell* decision," which first discussed the "similarly-situated employee" test. *Id.* (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir. 1992)). As the Sixth Circuit warned, "[a] prima facie standard that requires the plaintiff to demonstrate that he or she was similarly-situated in *every aspect* to an employee outside the protected class receiving more favorable treatment" would remove too many employees "from the protective reach of the anti-discrimination laws." *See id.* at 353 (emphasis added). The Sixth Circuit rejected such an approach, which "would undermine the remedial purpose of the anti-discrimination statutes." *Id.* Instead, and as relevant here, the court reiterated that, in the disciplinary context, the plaintiff need only show that "the individuals with whom the plaintiff seeks to compare [her] treatment must have . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* at 352 (quotation omitted).

Here, as in *Ercegovich* and other cases, Oster has "presented sufficient evidence to support a prima facie showing of discrimination." *Id.* at 353; *see also Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 778 (6th Cir. 2016) ("We conclude that Jackson sufficiently demonstrated that Duncan's and Little's actions were of 'comparable seriousness' to the conduct for which Jackson was discharged to establish a prima facie case.").

Oster, Coburn, and Bjertness all served as in-house counsel for Huntington. Prior to their common supervisor's arrival, Oster had some minor difficulties with other co-workers that Coburn and Bjertness did not experience. Even so, Oster's performance review for the preceding year indicated that she fully met or exceeded expectations in all areas, including her communications skills; that any strained relationships required work "by both sides"; and that Oster was making improvements in those areas. Nevertheless, the evidence suggests that Eck treated Oster in a *markedly* different manner than her male counterparts—including in ways that had nothing to do with Oster's ability to "manage down" to paralegals or "manage across" to other attorneys. This disparate treatment included commenting in a sexually suggestive manner on Oster's company photograph, micromanaging her day-to-day affairs, and cutting her off from senior management and outside counsel. As in *Jackson*, "differences [certainly] exist between [Oster], [Coburn], and [Bjertness]." 814 F.3d at 778. But "thorough explication of those differences is unnecessary for eliminating the most common nondiscriminatory reasons for the employer's [treatment]" of Oster. *Id.* (brackets omitted) (quotation omitted). Put differently, "those differences do not render [Oster] and her comparators so facially distinguishable as to obviate the need for [Huntington] to provide any explanation for its differential treatment." *Id.* (reserving discussion of those differences "for the later stages of the *McDonnel Douglas/Burdine* framework, in which the factual inquiry proceeds to a new level of specificity").

Based on the similarities between Oster, Coburn, and Bjertness—and the fact that neither Coburn nor Bjertness were micromanaged, harassed, dressed down in public, cut off from their supervisors or clients, or physically intimidated, the Court concludes that Oster "has sufficiently demonstrated circumstances giving rise to an inference of unlawful discrimination." *Id.* As such, Oster has met her "'not onerous' and 'easily met' preliminary burden of establishing a prima facie case" of gender discrimination for Counts I and II. *Id.* (quoting *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011)).

### 2.  Retaliation Claims (Counts III and IV)

#### *a.  The Prima Facie Case*

In Counts III and IV, Oster alleges retaliation, in violation of Title VII and Ohio Revised Code § 4112.02.  To establish a prima facie case of retaliation, Oster must prove the following: (1) she engaged in activity protected by Title VII and Revised Code § 4112.02; (2) the decision-maker knew of her protected activity; (3) she experienced an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action.  *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 468-69 (6th Cir. 2012); *see also Greer-Burger v. Temesi*, 879 N.E.2d 174, 180 (Ohio 2007).

#### *b.  Oster Has Shown a Prima Facie Case of Retaliation*

The Bank concedes that Oster suffered an adverse employment action.  The Bank argues, however, that she cannot satisfy the other three elements of a retaliation claim because: (1) her complaints about Eck were not protected activities; (2) Cheap (the ultimate decision-maker) had no knowledge of Oster's protected activity; and (3) Oster has no evidence that her protected activity was a "but for" cause of her termination.

*i. Protected Activity*

To establish an actionable retaliation claim, Oster first must show that her complaint to Huntington was about an alleged violation of Title VII. *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312-13 (6th Cir. 1989). Complaints or disagreements that essentially target "management decisions" do not qualify as "protected activity." *Kimbrough v. Cincinnati Ass'n for Blind & Visually Impaired*, 986 F. Supp. 2d 904, 917 (S.D. Ohio 2013).

Oster and the Bank spar over whether her complaints about Eck's treatment qualify as "protected activity" or were mere grievances over management decisions. Essentially, this is a "she said, they said" issue. Oster's deposition testimony shows that she *did* engage in protected activity when she complained to Human Resources. For example, Oster testified that she told Dahs that Eck was "physically threatening and intimidating, [and] had been verbally abusive." (Oster Dep., Doc. 55-1, PageID 974). She likewise told Dahs that Eck "was target[ing] me and was harassing me for some reason," and explicitly testified that she told Dahs, "if I was a man, he wouldn't be doing that to me." (*Id.*). Oster testified that she told the same things to Wilder when the two met. (*Id.* at PageID 984 ("I told her that I was afraid, that I was scared, that he was harassing me and bullying me. He was intimidating me. I felt like I was you know – he wouldn't be doing this if I was a man. I mean, all of his behavior was just so shocking.")).

To be sure, the Bank points to other evidence and shortcomings in Oster's evidence which suggest the crux of her complaints were management decisions, and not purported employment-law violations. (*See* Doc. 50, PageID 491-94 (citing deposition testimony and notes from Wilder, Dahs, Heaton, Eck, and Cheap, who all testified that Oster's complaints focused on Eck's management style and managerial decisions, rather than complaints of gender discrimination)).

But as the Bank concedes, "[Oster's] deposition testimony differs from this . . . record." (*Id.* at PageID 492). And the Sixth Circuit recognizes that a plaintiff may defeat summary judgment by her own testimony so long as that testimony creates a genuine dispute of material fact. *Moran v. Al Basit LLC*, 788 F.3d 201, 205 (6th Cir. 2015) ("This appeal raises one simple question: Where Plaintiff has presented no other evidence, is Plaintiff's testimony sufficient to defeat Defendant's motion for summary judgment? We hold that it is."); *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 (6th Cir. 2010) ("[Plaintiff's deposition] testimony alone is sufficient to create a jury question regarding the alleged replacement.") (collecting cases). Oster has done just that through her deposition testimony. The record might be "overwhelmingly consistent," as the Bank argues. But at this stage, the Court's role is not to make credibility judgments or to weigh the evidence. *Moran*, 788 F.3d at 204. Instead, the Court must view the evidence most favorably to Oster, *id.*, and having done so, the Court concludes that she has created a genuine dispute of fact as to whether she engaged in protected activity when she complained to Human Resources about Eck's conduct.

### ii. The Decision-Maker's Knowledge

To establish an actionable retaliation claim, Oster also must show that the decision-maker knew of her protected activity. *Frazier v. USF Holland, Inc.*, 250 F. App'x 142, 148 (6th Cir. 2007) ("The decisionmaker's knowledge of the protected activity is an essential element of the prima facie case of unlawful retaliation."). General "corporate knowledge" will not suffice. *Evans v. Prof'l Transp., Inc.*, 614 F. App'x 297, 300-01 (6th Cir. 2015) ("Contrary to their contention, plaintiffs cannot establish the second element of the prima facie case of retaliation merely by showing that [the employer] had 'general corporate knowledge' of their participation in [protected litigation].").

Oster and the Bank disagree over whether Cheap acted alone in terminating her employment, which seems dispositive to the knowledge element. Oster points to probative, sufficient evidence in the record that Cheap acted in concert with Eck, Wilder, and Heaton. For example, in the Bank's response to Oster's discovery interrogatories, the Bank stated that "Defendant Cheap, Defendant Eck, and Stephanie Wilder were involved in the decision to terminate [Oster's] employment." (Doc. 85-4, PageID 2365). Wilder, moreover, testified that she, Cheap, and Eck met on February 25, 2015, and discussed terminating Oster's employment. (Wilder Dep., Doc. 57, PageID 1247-48). Eck and Wilder both testified that they gave Cheap input on Eck's relationship with Oster at that meeting. (*Id.*; Eck Dep., Doc. 54, PageID 881). And Amy Heaton, who was Wilder's manager, and who knew about Oster's complaints, testified that Wilder recommended Oster's termination to her and Cheap, and that Heaton and Cheap both agreed with it. (Heaton Dep., Doc. 56, PageID 1114, 1151). Indeed, Wilder even sat in on Oster's termination meeting. And Oster points to other evidence suggesting that Cheap knew more about the nature of her complaints than he later acknowledged in his deposition. (*See* Doc. 84, PageID 2256). If Oster's view is correct, then the decision-makers knew of her protected activity because she complained directly and explicitly to Wilder about Eck's discriminatory conduct; Heaton knew about her complaints; and Cheap likely did too.

The Bank argues that just because a person was "involve[d]" in a termination decision does not make her the "decision maker." Fair enough. But the Bank does not seriously contest the evidence that Oster pointed to which, viewed most favorably to her, suggests her termination *was* the result of a group decision, from several decision-makers who knew about the protected activity. Instead, the Bank simply points to other evidence in the record that could be viewed to mean Cheap acted alone.

Again, the Court is left with a genuine dispute of material fact over whether Cheap acted alone in terminating her employment. If he did, Oster's prima facie case of retaliation likely fails to survive summary judgment.[4] If not, then her prima facie case succeeds. Where, as here, the evidence cuts both ways, "the judge's function is not himself to weight [it] and determine the truth of the matter." *Moran*, 788 F.3d at 204 (quotation omitted). Instead, the Court must determine only "whether there is a genuine [dispute] for trial." *Id.* (quotation omitted). Viewing the evidence most favorably to Oster, the Court concludes that she *has* established a genuine fact dispute for trial over the decision-makers' knowledge.

### iii. Causal Connection

Finally, to establish an actionable retaliation claim, Oster must show "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). In other words, Oster must show that "but for" her complaint of discrimination by Eck, she would not have been terminated. *Beard v. AAA of Mich.*, 593 F. App'x 447, 451 (6th Cir. 2014).

Oster and the Bank argue over whether her termination resulted from her complaints against Eck or because of years of interpersonal issues with co-workers, which culminated in her refusal to work with a new manager. Oster argues that the timing of her termination—roughly three weeks after she first complained about Eck's discrimination—coupled with other "weaknesses, inconsistencies, or contradictions" in the Bank's proffered reasons, show that her protected activity was the "but for" cause of her termination. (Doc. 84, PageID 2260 (quoting *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013))).

---

[4] Oster raises an alternative argument that, even if Cheap acted alone, the Court can impute Wilder's and Heaton's knowledge to him. (Doc. 84, PageID 2256-57 (citing *Evans*, 614 F. App'x at 303)). Because the Court finds a genuine fact dispute as to whether Cheap acted alone or in concert with others who knew about Oster's complaints, the Court need not reach her imputed-knowledge argument.

Temporal proximity alone can provide evidence of causality "in rare cases" where an adverse employment action occurs "very close in time" after an employer learns of the protected activity. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 524-25 (6th Cir. 2008) (explaining that, in those cases, the employee "would be unable to couple temporal proximity with any such other evidence of retaliation because the two actions happened consecutively"). Nevertheless, where, as here, "some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.* at 525; *see Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 628 (6th Cir. 2013) (same).

Oster points to evidence in the record that, if viewed most favorably to her, raises an inference of retaliatory conduct. As for her past performance and purported strained relationships, that evidence includes her favorable 2014 Performance Review, which indicated that she "fully meets" or "exceeds" expectations in all areas of her performance; deposition testimony from Heaton and Case showing she was making an effort to cultivate her communications skills, to improve relationships with her co-workers, and that—whatever communications difficulties were noted in her 2014 Review—were attributable to the other party too. (Doc. 84, PageID 2260-61 (collecting record cites)). Oster also points to her nomination for a leadership class in August 2014 and Wilder's positive comments regarding her selection to that class as evidence that her termination was retaliatory and *not* related to interpersonal conflicts at work. (*Id.* at PageID 2262). Finally, Oster notes that nobody from the Bank (other than Osborn) reported any interpersonal issues to her or suggested she needed to make improvements to save her job. (*Id.* at PageID 2264). From this, Oster argues that a reasonable jury could find evidence of retaliation and not just a termination due to past performance issues.

As for her purported inability to accept Eck as her new manager, Oster notes that Eck never complained about her until *after* she lodged her February 12, 2015 complaints against him. (*Id.* at PageID 2264). She also notes that neither Heaton nor Wilder believed her allegations about Eck to be false or unsubstantiated. (*Id.*). Yet, according to Heaton, the decision to terminate Oster was made just two weeks after she made her complaints about him to Dahs. (*Id.*). From this, Oster argues that a reasonable jury could find evidence of retaliation and not just a termination due to her inability to accept Eck's management.

The Bank counters with evidence that Oster had demonstrated interpersonal conflicts with fellow employees; that she had been disciplined for bullying a paralegal; that her 2014 Review indicated at least *some* communications conflicts with at least one co-worker; and that, under Oster's own version of events, Eck began mistreating her (though not firing her) long before she first lodged her discrimination complaint against him. From this evidence, the Bank argues that Oster has not established that her protected activity was a "but for" cause of her termination.

As with the other elements of Oster's retaliation claim, the Court discerns a genuine dispute of material fact over the "but for" cause of her termination. On one hand, the Bank cites evidence indicating that the defendants terminated Oster due to a history of interpersonal conflicts and her failure to accept Eck as her manager. On the other hand, Oster cites evidence showing a close proximity in time between the Bank learning of her protected activity and her termination, as well as independent evidence that suggests the Bank acted in retaliation *and* that contradicts or otherwise calls into question the Bank's stated reasons for her termination. Under these circumstances, the Court must view the evidence most favorably to Oster and conclude that her prima facie case of retaliation survives summary judgment. *See Moran*, 788 F.3d at 204.

### 3.  The Remainder of the *McDonnell Douglas* Burden-Shifting Analysis

Because Oster has established a prima facie case of gender discrimination and retaliation, the burden of production shifts to the Bank to set forth "a legitimate, nondiscriminatory reason" for her termination.  *Hoskins*, 227 F.3d at 731; *see also Spengler*, 615 F.3d at 492 (same). Oster concedes that the Bank has set forth legitimate, nondiscriminatory reasons—namely, "because of her unwillingness to accept Eck as her manager and failure to improve her interactions with others."

Accordingly, "the burden shifts back to [her] to demonstrate that [the Bank's] proffered reason was not the true reason for the employment decision."  *Spengler*, 615 F.3d at 492 (quotation omitted).  In other words, to defeat summary judgment, Oster must show that a jury reasonably could find that the Bank's asserted reasons for terminating her were pretextual. *Id.* at 492-93.  Oster may demonstrate that the Bank's asserted reasons were pretextual by proving that they: (1) had no basis in fact; (2) did not actually motivate her termination; or (3) were insufficient to explain her termination.  *Id.* at 493.

At the outset, Oster correctly argues that "suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence."  *See Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012) (quotation omitted).  Nevertheless, the law in this Circuit remains clear "that temporal proximity cannot be the *sole* basis for finding pretext."  *Id.* (emphasis added) (quotation omitted).  Thus, while the Court recognizes some indication of pretext from the proximity between Oster's complaints of discrimination and the Bank's decision to terminate her (which occurred roughly two to three weeks apart), the Court must look to the rest of the record to determine whether a jury reasonably could reject the Bank's explanations for her firing.

*i. Whether the Proffered Reasons Lacked any Basis in Fact*

Oster first argues that the Bank's reasons lacked any basis in fact—i.e., that they were false. She also argues that the Bank's reasons changed over time, thus undercutting their veracity. *See Cicero v. Borg-Warner Auto, Inc.*, 280 F.3d 579, 592 (6th Cir. 2002) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext." (quotation omitted)). She notes Cheap's explanation during her termination meeting that the Legal Department was "going in a different direction." (Doc. 84, PageID 2267). She then points to Cheap's 2016 deposition, when he amplified that explanation by stating, "I don't remember exactly what I said but essentially I did not want to get into a debate, that my decision had been made." (*Id.* at PageID 2268). She also notes that Wilder testified that "different direction" meant a "cultural change, a change in the litigation process"—to improve the process. (*Id.*). And yet, in its May 23, 2016 response to Oster's discovery interrogatories, the Bank claimed that Oster was terminated because of "her unwillingness to accept the recently-hired Defendant Eck as her supervisor and her failure to improve her interactions with others after receiving previous discipline and counseling." (*Id.* at PageID 2269). To Oster, these explanations, combined with other cherry-picked gaps in the record, undercut one another and show that the Bank's proffered reasons lacked any basis in fact.

The Bank counters that the record contains ample evidence to support its proffered reasons. For example, Cheap consistently testified that Oster was terminated "[b]ecause [of] the continuing pattern of being unable to work with Tom Eck, [which] I viewed as a continuation of her inability to work with members of the legal department and others outside the legal department." (Doc. 93, PageID 2701). Likewise, when asked the reason for Oster's termination, Wilder testified that Oster had a "history of interpersonal issues" and "she was not getting along

with the new manager," including "fighting his desire to change the way workload was structured on the team." (*Id.* at PageID 2701-02). The Bank notes that Oster's own response in opposition to its motion for summary judgment reflects these conflicts between Oster and Eck. And, as the Bank points out, Oster's 2014 Performance Review did note at least some "strained" relationships with co-workers, and she was disciplined for bullying a co-worker in October 2014.

As for Oster's allegation of "shifting explanations," the Bank counters that the phrase "going in a different direction" does not undercut any of its later, more detailed explanations. Instead, the Bank argues that Cheap's initial statements regarding "going in a different direction" encompass the reasons the defendants consistently have provided for Oster's termination. The Bank cites *Marshall v. Belmont County Board of Commissioners*, 110 F. Supp. 3d 780 (S.D. Ohio 2015), *aff'd*, 634 F. App'x 574 (6th Cir. 2016), for support. In *Marshall*, this Court agreed that the shifting-explanations rule applies only "when an employer's reason for allegedly [unlawful] actions changes in a *material* way throughout the stages of litigation." *Id.* at 793 (quotation omitted). The *Marshall* plaintiff, the county's 911 center director, was told that the center was being taken in a "better direction" in her termination meeting. *Id.* Yet in a later press release and in litigation, the county provided a more detailed reason—that the plaintiff had been terminated for disciplining a subordinate, in defiance of county commissioners' instructions. *Id.* The court found no inconsistencies, noting that the phrase "better direction" was a "generic statement that could be reasonably read to encompass . . . the proffered reason for termination." *Id.*; *see also, e.g.*, *Maletich v. La Z-Boy Inc.*, No. 11-14615, 2013 WL 3328302, at *17 (E.D. Mich. July 2, 2013) (holding that "brief statement" in termination meeting of "moving in a different direction" was not inconsistent with a later, more detailed reason).

As in *Marshall* and *Maletich*, Cheap provided a brief and general statement that encompasses the Bank's proffered reasons for Oster's termination. Thus, a reasonable jury could not find pretext on the basis of purported shifting explanations. Moreover, Oster has failed to show that the Bank's stated reasons for terminating her lack *any* basis in fact or were false. The record contains ample evidence that she refused to accept Eck's management and that she had some history of strained personal relationships within the Legal Department. Even viewed in connection with the close proximity between her protected activity and her termination, Oster has failed to show that a reasonable jury could find pretext under this theory.

### ii. Whether the Proffered Reasons Actually Motivated her Termination

Oster next argues that the Bank's proffered reasons did not actually motivate her termination. She offers three credible bases to support her argument: (1) Cheap's decision in early February 2015 to approve a $30,000 bonus for her 2014 performance[5]; (2) her satisfactory 2014 Performance Review; and (3) the lack of complaints from Eck regarding their relationship until after she began complaining about him in February 2014. In short, Oster argues that it was Eck's arrival and her subsequent complaints about his discrimination that truly motivated her termination—not anything that previously occurred. *See Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (explaining that, under the second method of showing pretext, "the plaintiff attempts to indict the credibility of [the] employer's explanation" by showing "that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup"), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

---

[5] In early February 2015, Cheap recommended Oster for an annual bonus of $30,000 based on her 2014 performance. (Cheap Dep., Doc. 62-1, PageID 1800). The bonus was set to be paid on March 6, 2015. (*Id.* at PageID 1849). Nevertheless, Cheap cancelled her bonus in a perfunctory email on February 25, 2015—two weeks after Oster complained about Eck to Human Resources. (*Id.* at PageID 1861-62).

The Bank counters that Oster's 2014 bonus award and her 2014 Review spoke strictly of her "performance" at work, and not the Bank's stated reasons for her termination. (Doc. 93, PageID 2704 ("It is true, the record conflicts on Plaintiff's performance. But that conflict is immaterial since Defendants have never claimed she was terminated for poor performance.")). But the Bank does not cite a single case in support and, in any event, its argument assumes too much. It stands to reason Cheap might not approve a $30,000 bonus for Oster in February 2015 if he had her termination in mind due to *ongoing* interpersonal issues at the Bank. Likewise, Oster's 2014 Review expressly considered and assessed more than just her "performance." It included several metrics, including Oster's accountability, communication, inclusion, teamwork, and a catch-all category for "other." (Doc. 85-5, PageID 2388-95). As noted before, Oster fully met or exceeded expectations on all metrics for calendar year 2014, thus providing more evidence that her termination may not have been due to *ongoing* interpersonal difficulties. Finally, the Bank does not dispute Oster's assertion that Eck never complained to anyone about Oster's acceptance of his management until *after* she lodged her own complaints regarding his purported discrimination. (Heaton Dep., Doc. 56-1, PageID 1145-46 ("Q: And before Jody raised her complaints about Tom Eck, Tom Eck never complained to you or anyone in human resources that Jody would not accept him as her supervisor; is that true? A: Not that I'm aware of."); *see also* Eck Dep., Doc. 54-1, PageID 887 (similar)).[6]

---

[6] In its reply brief, the Bank suggests that the "honest belief" rule insulates its conduct, although the Bank's discussion of the rule occurred in connection with Oster's prima facie retaliation claim, and not in connection with her claim of pretext. (Doc. 93, PageID 2698-99). Regardless, this Court agrees that the "honest belief" rule has no place when a plaintiff argues pretext on the basis of the employer's proffered reasons not actually motivating the adverse employment decision, as Oster argues here. *Amos v. McNairy Cnty.*, 622 F. App'x 529, 541 n.10 (6th Cir. 2015) (explaining that the "honest belief" rule "responds more logically to the 'had no basis in fact' theory of pretext" and "will be redundant in most cases" alleging pretext on the basis of the employer's true motivation for the adverse action); *Phipps v. Accredo Health Grp., Inc.*, No. 2:15-cv-02101, 2016 WL 3448765, at *15 & n.94 (W.D. Tenn. June 20, 2016) (denying summary judgment to defendant on same basis).

The Court finds that, after drawing all reasonable inferences in Oster's favor, a reasonable jury could conclude the Bank's stated reasons did not actually motivate her termination given the following: (1) the close proximity between Oster's complaints and her termination; (2) substantial evidence showing that her termination seemed unlikely until Eck's arrival and her complaints; and (3) the absence of evidence showing that Eck voiced concerns over her acceptance of his management until she complained about his discrimination. Accordingly, Oster's gender discrimination and retaliation claims survive the Bank's motion for summary judgment. *See Ercegovich*, 154 F.3d at 357 (holding that summary judgment was inappropriate where plaintiff established a prima facie case and produced sufficient evidence contradicting employer's proffered legitimate reason to create triable issues of fact for jury).

### iii. *Whether the Proffered Reasons Were Insufficient to Explain her Termination*

Finally, Oster argues that the Bank's proffered reasons were insufficient to explain her termination. To avoid summary judgment on this ground, Oster must present "evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Manzer*, 29 F.3d at 1084. Oster argues that she and *Eck* engaged in substantially identical conduct, but that only she was fired for it. She points to her alleged "bullying" of Paralegal Susan Wangler and compares it to Eck's purported bullying of her. She then argues that a reasonable jury could conclude that Eck, who participated in the decision to terminate her, engaged in conduct that was substantially worse than her own conduct, "casting doubt on the credibility of [the Bank's] claimed reason for terminating [her]," and demonstrating that the reason was insufficient to explain her termination. (Doc. 84, PageID 2275).

The Bank responds that Oster was not terminated solely for her bullying of Wangler. Had that been the case, Oster's employment would have ended much sooner than March 2015. Instead, the Bank argues that Oster stands alone in being terminated both for her "continued difficulties in getting along with others," (not just Wangler), *and* "in her rejection of her manager's authority." (Doc. 50, PageID 498). The Bank concludes that, since there are no allegations, let alone any evidence that the decision-makers were aware of, but failed to terminate similarly situated employees from outside the protected class who engaged in similar behavior, this pretext theory must fail. *See Jackson*, 814 F.3d at 789 ("Where an employer argues that the plaintiff's differential discipline was justified by material differences in context, we evaluate whether that justification is pretextual by looking to the same or similar factors as when evaluating the 'similarly situated' element of the prima facie case.").

The Court agrees with the Bank. Oster has failed to point to an employee from outside her protected class who was similarly situated in all relevant respects to show that the Bank's proffered reasons were insufficient to explain her termination. *See id.* at 780 ("When conducting this more rigorous comparison [to ascertain pretext], we again focus on the severity of the differently treated employees' actions."). Oster has not cited *any* evidence that Eck had a comparable history of interpersonal conflicts, or that he rejected management from his supervisors. Accordingly, Oster has not created a genuine dispute of material fact under her third and final pretext theory.

Nevertheless, because Oster has made out a prima facie case of gender discrimination and retaliation, and because she has created a genuine dispute of material fact as whether the Bank's proffered reasons actually motivated her termination, the Court **DENIES** the Bank's motion for summary judgment on those claims.

Oster also attempts to shoehorn a hostile work environment claim into her response in opposition to summary judgment, but she did not plead such a claim in her complaint. Gender discrimination and hostile work environment constitute separate legal claims, with different elements. *Vicker v. Fairfield Med. Ctr.*, 453 F.3d 757, 762 (6th Cir. 2006). Oster knew how to plead separate causes of action, but she chose not to add a hostile work environment claim. Nor did she seek leave to amend her complaint. Under these circumstances, the Court cannot allow a new cause of action to proceed. *See Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 665 (6th Cir. 2012) (rejecting attempt to add new claim at summary judgment); *Baker v. City of Toledo*, No. 3:05-cv-7315, 2007 WL 1101254, at *6 & n.5 (N.D. Ohio Apr. 11, 2007) (finding it "clear" that plaintiff failed to plead a hostile work environment claim where her complaint alleged only that the defendant "harassed and retaliated against her because of her gender"). Accordingly, Oster may proceed to trial only on her properly pleaded gender discrimination and retaliation claims.

* * * * *

As a coda to consideration of Oster's Title VII claims, the Court **GRANTS** Thomas Eck's and Richard Cheap's motion for summary judgment on Counts I and III. As Eck and Cheap note, "Title VII does not allow for liability on the part of any person or entity other than [an] 'employer.'" *Han v. Univ. of Dayton*, 541 F. App'x 622, 629 (6th Cir. 2013). And, under 42 U.S.C. § 2000e, an "employer" does not include a plaintiff's "supervisors," "managers," or "co-workers." *Id.* (quoting *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 404 (6th Cir. 1997)). Thus, Eck and Cheap are entitled to judgment as a matter of law on Oster's Title VII claims. *Id.*

By contrast, "Ohio Rev. Code § 4112.02 has been interpreted to allow 'employer' liability for discrimination attached to [a plaintiff's] supervisors or managers." *Id.* Thus, consistent with the analysis outlined above, the Court **DENIES** the individual defendants' motion for summary judgment on Count II (gender discrimination under Ohio law) and Count IV (retaliation under Ohio law). *Id.*

### 4. Aiding and Abetting Claim (Count V)

Finally, in Count V, Oster alleges that individual defendants Eck and Cheap violated Ohio Revised Code § 4112.02(J) by aiding, abetting, inciting, compelling, and/or coercing unlawful gender discrimination and retaliation against her. To be held liable for aiding and abetting under this provision, an individual defendant must be "involved in or actually [have] made the decision to [discriminate or] retaliate against [the employee]." *Cummings v. Greater Cleveland Reg'l Transit Auth.*, 88 F. Supp. 3d 812, 820 (N.D. Ohio 2015); *Sampson v. Sisters of Mercy Willard, Ohio*, No. 3:12-cv-824, 2015 WL 3953053, at *9-10 (N.D. Ohio June 29, 2015) (similar).

Oster argues that Eck and Cheap aided and abetted one another, as well as the Bank, in discriminating and retaliating against her in the following ways: (1) Cheap "rigged" the stay interviews in 2014 to specifically target Oster; (2) Cheap gave Eck a license to harass, intimidate, and discriminate against Oster without fear of reprisal when he told Eck that he was Oster's "last shot" a week after Eck began work; and (3) Eck and Cheap both knew about the "explosive" February 12, 2015 meeting between Eck and Oster, as well as Oster's complaints about Eck's discrimination, when they met to discuss her termination on February 25, 2015.

The Bank does not seriously contest Oster's allegations or the evidence she cites in support. Instead, the Bank raises two arguments, both of which lack merit. *First*, the Bank contends that, beyond "unfounded conspiracy theories," Oster "has no new evidence to support her aiding and abetting claims beyond that which fails to adequately support her discrimination and retaliation claims." (Doc. 93, PageID 2709). As explained above, however, Oster can survive summary judgment on her gender discrimination and retaliation claims, so her allegations and evidence of aiding and abetting by Eck and Cheap pass muster too.

*Second*, the Bank argues that "for purposes of R.C. 4112.02(J), defendants who are all associated with the same corporate entity, as Defendants are here, cannot aid and abet themselves." (*Id.* at PageID 2709-10 (citing *Sampson*, 2015 WL 3953053, at *9-10)). To be sure, *Sampson* held that a corporate entity cannot aid and abet itself in employment discrimination. *Sampson*, 2015 WL 3953053, at *10 ("[Defendant] Mercy Willard cannot aid or abet itself in discriminating against [Plaintiff]."). But here, Oster has not alleged that the *Bank* aided or abetted itself in discriminating and retaliating against her. Rather, she alleged that *Eck* and *Cheap* aided and abetted one another, as well as the Bank, in its unlawful employment practices. As such, the Bank's argument under *Sampson* lacks merit.

Because Oster cited sufficient evidence for the proposition that Eck and Cheap were "involved in" or "actually made the decision to [discriminate and] retaliate against [her]," *see Cummings*, 88 F. Supp. 3d at 820, the Court **DENIES** the individual defendants' motion for summary judgment on her aiding and abetting claim (Count V).

## C. Oster's Motion for Summary Judgment

Huntington raised an after-acquired evidence defense by alleging that it would have fired Oster anyway given misconduct on her behalf that the Bank later discovered. That misconduct includes the following: (1) a January 20, 2016 Judgment Entry in which Oster was found in contempt for violating an order of the domestic relations court; (2) Oster's surreptitious audio recording of two discussions that occurred at or near her termination; (3) Oster's retention and emailing to her personal email address of what the Bank claims were "confidential and/or privileged" documents following her termination; and (4) Oster's application for a modification of her personal mortgage loan with the bank without being forthright as to her marital status. Oster has moved for summary judgment on this defense.

The after-acquired evidence defense sounds in equity and limits a plaintiff's damages for misconduct which, if known by the employer, would have resulted in the plaintiff's termination anyway. *See, e.g.*, *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 361-62 (1995); *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1168 (6th Cir. 1996) ("This doctrine applies to bar an employee from obtaining certain remedies in a discrimination case."). If a jury finds the employer liable but the employer proves that after-acquired evidence would have resulted in the plaintiff's termination, then the plaintiff's damages are cut off as of the date the employer learned of the misconduct. *McKennon*, 513 U.S. at 361-62 ("We do conclude that here, and as a general rule in cases of this type, neither reinstatement nor front pay is an appropriate remedy."); *Thurman*, 90 F.3d at 1168 ("As a general rule, under the after-acquired evidence doctrine the employee is barred from obtaining front pay and reinstatement, and backpay is limited." (citation omitted)).

When an employer relies on after-acquired evidence of wrongdoing, "it must establish first, that the wrongdoing in fact occurred, and second, that the wrongdoing was of such severity that the employee *would in fact have been terminated*." *Wehr v. Ryan's Family Steak Houses, Inc.*, 49 F.3d 1150, 1154 n.5 (6th Cir. 1995) (emphasis added) (quotation omitted). Thus, the proper inquiry is whether the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of discharge, not just that the employer *could* have terminated the employee. *See McKennon*, 513 U.S. at 362-63; *Wehr*, 49 F.3d at 1154 n.5.

Although some jurisdictions limit the after-acquired evidence defense to *pre*-termination misconduct, the Sixth Circuit has suggested that consideration of *post*-termination misconduct is permissible as well, at least under appropriate circumstances. *See Jones v. Nissan N. Am., Inc.*, 438 F. App'x 388, 406 (6th Cir. 2011). And lower courts within this Circuit, including the Southern District of Ohio, have interpreted *Jones* to allow consideration of post-termination misconduct under appropriate circumstances. *See, e.g.*, *James v. Kaiser Aluminum Fabricated Prods., LLC*, No. 2:11-cv-847, 2013 WL 1787382, at *2 (S.D. Ohio Apr. 25, 2013) ("The court finds here that evidence of the fact of James's post-termination jail time is plainly relevant to the issue of damages." (citing *Jones*, 438 F. App'x at 405-07)); *Nemeth v. Citizens Fin. Grp.*, No. 08-cv-15326, 2012 WL 3262876, at *5 (E.D. Mich. Aug. 9, 2012) ("Although the Court is inclined to conclude that a fair reading of *Jones v. Nissan North America, Inc.* . . . would permit the after-acquired evidence defense to be asserted based on post-termination conduct under appropriate circumstances, . . . the Court will defer ruling on this issue pending further discovery related to this defense." (citations omitted)).

Here, the Bank argues that, even if it is found liable on Oster's underlying claims, its damages must be limited under the after-acquired evidence defense. In short, the Bank argues that it would have terminated Oster for violating Huntington's Code of Business Conduct and Ethics and its Use of Communications Media Policy anyway had it known of her misconduct.

Oster moves for summary judgment on several grounds. *First*, she argues that the Court should not consider evidence of her post-termination misconduct, including her contempt of the domestic relations court; her surreptitious audio recordings, which occurred on or after the date of her termination; or her retention of supposedly privileged and/or confidential Bank materials. The Court agrees that this is *not* an unusual case in which her *post*-termination misconduct should be considered in connection with the Bank's defense. Unlike in *Jones*, where the misconduct occurred while the employee was on FMLA leave, but *still employed*, Oster was terminated outright on March 4, 2015. *See Jones*, 438 F. App'x at 407. And unlike in *James*, Oster was not in prison following her employment, and thus, reinstatement remains a viable remedy should she prevail at trial. *See James*, 2013 WL 1787382, at *2. Although some jurisdictions allow consideration of post-termination misconduct in *all* after-acquired evidence defenses, the Sixth Circuit has not gone so far, *see Jones*, 438 F. App'x at 407, so neither will this Court. Imagine the perverse incentives created if employers were rewarded for rummaging around an ex-employee's life following his or her termination, all in the name of creating some post-hoc rationale for that very termination. It stands to reason that losing one's job may create unexpected and unordinary hardships in a person's life—hardships that, in any event, easily could be spun to justify the underlying termination. The Court cannot sanction such an approach in an ordinary situation like this. Accordingly, the Court will not allow the Bank to present evidence of Oster's misconduct following her termination on March 4, 2015.

*Second*, Oster argues that none of her pre-termination misconduct violated Bank policies, as the Bank contends. As the briefing makes clear, however, genuine disputes of material fact remain for a jury to decide with respect to this aspect of the Bank's after-acquired evidence defense. For example, the parties present conflicting evidence as to whether Huntington employee Sean Roehrenbeck, who assisted Oster with her 2014 mortgage modification, knew of her marital status, or had reason to believe that she lied when she wrote "divorce pending" on her application. (*Compare* Doc. 58, PageID 1376, *with* Doc. 82, PageID 2191). Likewise, the parties present conflicting evidence as to whether Oster's transmission of privileged and/or confidential bank documents amounted to protected activity or a violation of Bank policies. (*Compare* Doc. 58, PageID 1368-76, *with* Doc. 82, PageID 2192-96). And the parties cite conflicting evidence as to whether it was "common practice" to forward confidential documents to personal email addresses and as to whether Oster in fact received permission from management to do so. (*Compare* Doc. 58, PageID 1374-75, *with* Doc. 82, PageID 2196-98). Drawing all reasonable inferences in the Bank's favor, the Court cannot grant summary judgment to Oster on this basis.

*Finally*, Oster argues that none of the alleged pre-termination misconduct *would in fact* have led to her termination. The parties vehemently disagree (and present conflicting evidence) as to whether the Bank would in fact have terminated Oster for some, or all, of these transgressions, or whether the Bank merely *could* have terminated her for them. Oster attempts to isolate each instance of misconduct and then argues that, on an individual basis, not one infraction actually violated Bank policy or *would* have led to her termination, because no attorney had been fired for any of these infractions in the past.

The Bank counters that Oster interprets its policies to her own liking and artificially isolates her course of misconduct. The Bank argues that much of her conduct, even viewed individually, *did* violate corporate policies and, that, in any event, when viewed cumulatively, Oster's misconduct surely *would* have led to her termination had the Bank only known of it sooner. Relatedly, the Bank contends that it is irrelevant that it has not had to fire an attorney for any singular infraction before, because "any attorney who engaged in the breadth of misconduct committed by [Oster] would be terminated from Huntington." (Doc. 82, PageID 2199). Indeed, Huntington's General Counsel attests that he would have terminated Oster for that very misconduct (*id.*), and, as already noted, a party can survive summary judgment based on his or her testimony alone. *See Moran*, 78 F.3d at 205.

Drawing all reasonable inferences in the Bank's favor, the Court concludes that genuine disputes of material fact remain for trial. Conflicting evidence exists as to whether Oster's actions violated the Bank's policies and whether the Bank would in fact have terminated her employment over that alleged misconduct. Accordingly, the Court **GRANTS in part** and **DENIES in part** Oster's motion for summary judgment.

## IV. CONCLUSION

For these reasons, the Court: (1) **GRANTS in part** and **DENIES in Part** Oster's motion to strike (Doc. 81); (2) **GRANTS in part** and **DENIES in part** the Bank's motion for summary judgment (Doc. 50); and (3) **GRANTS in part** and **DENIES in part** Oster's motion for summary judgment (Doc. 58). Oster may go to trial on her gender discrimination, retaliation, and aiding and abetting claims (as circumscribed above with respect to Eck and Cheap), while the Bank may assert its after-acquired evidence defense as to Oster's alleged *pre*-termination misconduct.

**IT IS SO ORDERED.**

       **/s/ Algenon L. Marbley**
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: May 19, 2017**